**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 11-cv-02883-MSK

**SHALONDA L. HICKS,**

    Plaintiff,

v.

**MICHAEL J. ASTRUE, Commissioner of Social Security,**

    Defendant.

**OPINION, ORDER, AND JUDGMENT**

**THIS MATTER** comes before the Court on Plaintiff Shalonda L. Hicks' appeal from the Commissioner of Social Security's final decision denying her application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83c. Having considered the pleadings and the record, the Court

**FINDS** and **CONCLUDES** that:

**I.     Jurisdiction**

Ms. Hicks filed claims for disability insurance benefits pursuant to Title II and supplemental security income pursuant to Title XVI. She asserted that her disability began on September 2, 2008. These claims were initially denied, and Ms. Hicks filed a written request for a hearing before an Administrative Law Judge ("ALJ"). This request was granted and a hearing was held.

After the hearing, the ALJ issued a decision in which he found that Ms. Hicks met the insured status requirements of the Social Security Act through December 31, 2012. Additionally, the ALJ made the following findings: (1) Ms. Hicks had not engaged in substantial gainful activity since September 2, 2008; (2) Ms. Hicks had three severe impairments: diabetes, gastroparesis, and fibromyalgia;[1] (3) none of these impairments, whether considered individually or in combination, met or were equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1 ("the Listings"); (4) Ms. Hicks had the Residual Functional Capacity ("RFC") to perform the full range of light work, but was limited to sitting for a total of six hours in an eight hour workday, standing and/or walking a total of six hours in an eight hour workday, frequently perform postural maneuvers, occasionally climbing stairs and ramps, never climbing ladders, ropes, or scaffolding, and never working near unprotected heights; and (5) Ms. Hicks was not disabled because she was able to perform two of her past jobs, receptionist and cashier.

The Appeals Council denied Ms. Hicks' appeal of the ALJ's decision. Consequently, the ALJ's decision is the Commissioner's final decision for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011). Ms. Hicks' appeal was timely brought, and this Court exercises jurisdiction to review the Commissioner of Social Security's final decision pursuant to 28 U.S.C. § 405(g).

**II.    Material Facts**

Having reviewed the record in light of the issues raised, the Court summarizes the pertinent facts but will include additional facts in its discussion as necessary. Ms. Hicks suffers from nausea, vomiting, diarrhea, and stomach pain. According to the record, Ms. Hicks first complained of these symptoms in the fall of 2007. In November of that year, she was admitted

---

[1] Gastroparesis is a disorder that slows or stops the movement of food from the stomach to the small intestine. *Gastroparesis*, National Digestive Diseases Information Clearinghouse (NDDIC), http://digestive.niddk.nih.gov/ddiseases/pubs/gastroparesis/ (last visited March 12, 2013).

to the ER with complaints of nausea and vomiting that had become worse over several months, as well as diarrhea and abdominal pain. At that time, Dr. Haque diagnosed her as suffering from gastroparesis.

Although she sought regular evaluation and treatment, Ms. Hicks' symptoms continued unabated. Ms. Hicks visited her treating physician, Dr. Wilk, thirteen times between November 2007 and June 2010. During twelve of these visits, Dr. Wilk listed gastroparesis as a diagnosis, an assessed ailment, or a historical ailment. Ms. Hicks reported vomiting during at least eight of these visits. She also saw a specialist, Dr. Burrows, three times in January and February 2008. He also attributed her symptoms to gastroparesis.

In addition to these regularly scheduled doctor visits, Ms. Hicks was also admitted to the emergency room at least nine times between November 2007 and November 2008. During seven of these visits, she complained of severe nausea and vomiting.[2] Although her symptoms were well documented and her physicians, with the exception of Drs. Hasan and Duman at the University of Colorado Hospital, generally ascribed them to gastroparesis, numerous tests were inconclusive as to the cause of her symptoms. Between 2007 to 2009, Ms. Hicks underwent multiple exams and several tests and procedures, including CT scans in November 2007 and May, June, July, and November of 2008, a colonoscopy in January 2008, x-rays in November 2008, endoscopies in November 2008 and January 2009, and a gastric emptying study in January 2009. These tests produced normal results and revealed very little about the cause of Ms. Hicks symptoms. Ms. Hicks was also given several different anti-nausea, anti-emetic, and pain medications in an attempt to relieve her symptoms. These included Zofran, Reglan, Pepcid, Ondansetron, and Phenergen.

---

[2] An eighth ER visit during November 2008, was due to a syncope, or fainting spell. However, Ms. Hicks reported that she had not eaten in two days due to chronic vomiting and nausea.

Although the extent to which these symptoms affect Ms. Hicks is one of the questions before this Court and will be addressed *infra*, it is clear that Ms. Hicks modified her lifestyle significantly since her symptoms began.  Ms. Hicks testified at the hearing that she has nausea and diarrhea every day and vomiting up to four days per week or every other day.  As a result, she is unable to sit, stand, or walk for extended periods of time, cannot lift objects over ten pounds, and must lay down to curb her symptoms.  These limitations correlate with the limitations she asserted in a December 2008 Function Report, a March 2009 physical exam, and an April 2009 Physical Residual Functional Capacity Assessment.   According to her testimony she has not held a job since October 2008 and has sent her young son to live with her parents during the weekdays.

Dr. Wilk corroborated Ms. Hicks' statements regarding her symptoms.  In February 2010, he opined in a form entitled Workforce Development Medical Report that Ms. Hicks would not be able to participate in classroom activity, work or training activity, or search for a job due to intractable and unpredictable vomiting and medication side effects.  Dr. Wilk further stated that Ms. Hicks was able to sit, stand, walk, and lift up to ten pounds frequently.

**III.    Issues Presented**

Ms. Hicks raises three challenges to the Commissioner's decision: (1) the ALJ's findings were not based on substantial evidence; (2) the ALJ improperly evaluated Ms. Hicks' credibility and, therefore, improperly found that she had the Residual Functional Capacity ("RFC") to perform work at Step 4 of the sequential evaluation process; and (3) the ALJ did not give proper weight to the opinions of Dr. Wilk, Ms. Hicks' treating physician.  The Court will address the first two issues together, followed by the third issue.

### IV.     Standard of Review

Judicial review of the Commissioner of Social Security's determination that a claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'  It requires more than a scintilla, but less than preponderance."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotation omitted).  On appeal, a reviewing court's job is neither to "reweigh the evidence nor substitute our judgment for that of the agency."  *Branum v. Barnhart*, 385 F.3d 1268, 1270, 105 Fed. Appx. 990 (10th Cir 2004) (*quoting Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

When considering whether a claimant is disabled, the ALJ must take into consideration all of a claimant's symptoms, including subjective symptoms.  20 C.F.R. § 404.1529(a).  Subjective symptoms are those that cannot be objectively measured or documented. One example is pain, but there are many other symptoms which may be experienced by a claimant that no medical test can corroborate.  By their nature, subjective symptoms are most often identified and described in the testimony or statements of the claimant or other witnesses.

In assessing subjective symptoms, the ALJ must consider statements of the claimant relative to objective medical evidence and other evidence in the record.  20 C.F.R. §404.1529(c)(4).  If a claimant has a medically determinable impairment that could reasonably be expected to produce the identified symptoms, then the ALJ must evaluate the intensity,

severity, frequency, and limiting effect of the symptoms on the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1); SSR 96-7p.

In the 10th Circuit, this analysis has three steps: 1) the ALJ must determine whether there is a symptom-producing impairment established by objective medical evidence; 2) if so, the ALJ must determine whether there is a "loose nexus" between the proven impairment and the claimant's subjective symptoms; and 3) if so, the ALJ must determine whether, considering all the evidence, both objective and subjective, claimant's symptoms are in fact disabling. *Luna v. Bown*, 834 F.2d 161, 163-64 (10th Cir. 1987).[3] The third step of the *Luna* analysis involves a holistic review of the record. 20 C.F.R. § 404.1529(c)(3) instructs the ALJ to consider:

> 1) [t]he individual's daily activities; 2) [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) [f]actors that precipitate and aggravate the symptoms; 4) [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms…; and 7) [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Inherent in this review is an assessment of whether and to what degree there are conflicts between the claimant's statements and the rest of the evidence. *Id*. Ultimately, the ALJ must make specific evidentiary findings[4] with regard to the existence, severity, frequency, and limiting

---

[3] The ALJ need not follow a rote process of evaluation, but must specify the evidence considered and the weight given to it. *Qualls v. Apfel*, 206 F3d 1368, 1372 (10th Cir. 2000).

[4] Often these findings are described as "credibility determinations". Technically, the credibility assessment is as to particular testimony or statements. But this characterization often improperly leads ALJs and claimants to focus upon whether the claimant is believable or "telling the truth". Such focus is reflected in ALJ references to the "claimant's credibility" and claimants' umbrage at ALJ findings that suggest that they were untruthful.

Greater precision in focusing on the credibility of particular testimony is helpful for subsequent review. In addition, it is rarely necessary for an ALJ to determine the ontological truth or falsity of a claimant's statements as to the existence of a symptom. Indeed, the very definition of a subjective symptom assumes that it cannot be medically verified or quantified. Most often, the ALJ need not determine whether the claimant is truthfully reporting the existence of the symptom. The more difficult determination is as to its intensity, frequency, duration and effect.

effects of the subjective symptoms on the claimant's ability to work. 20 C.F.R. § 404.1529(c)(4). Such evidentiary findings must be supported by substantial evidence. *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988); *Diaz*, 898 F.2d at 777.

Turning to the analysis of medical opinions, a treating physician's opinion must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ must give specific and legitimate reasons to reject a treating physician's opinion or give it less than controlling weight. *Drapeau v. Massanari*, 255 F.3d 1211 (10th Cir. 2001). Even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and must be weighed using the following factors:

> 1) the length of the treatment relationship and the frequency of examination;
> 2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; 3) the degree to which the physician's opinion is supported by relevant evidence; 4) consistency between the opinion and the record as a whole; 5) whether or not the physician is a specialist in the area upon which an opinion is rendered; 6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1300-01 (citation omitted); 20 C.F.R. § 404.1527. Having considered these factors, an ALJ must give good reasons in his decision for the weight assigned to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). The reasons must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight. *Watkins*, 350 F.3d at 1301.

---

Where there is no corroboration in the claimant's testimony as to these factors, the ALJ may be called upon to assess the credibility of the claimant's reports.

**V.     Discussion**

The core issue in this case is whether the ALJ's findings at Step 4 regarding Ms. Hicks' statements with regard to her subjective symptoms were supported by substantial evidence.

**A.  The ALJ's Findings**

The ALJ found that Ms. Hicks had three severe impairments: diabetes, gastroparesis, and fibromyalgia.  However, he found that the evidence in the record did not support Ms. Hicks' statements about the severity, frequency, and limiting effects of her subjective symptoms - nausea, vomiting, diarrhea, and abdominal pain.

He began his analysis by summarizing Ms. Hicks' statements about her symptoms.  She testified that she experienced nausea daily, vomiting daily or every other day, and diarrhea frequently.  According to her, these symptoms also caused shakiness, a limited ability to stand, and weight loss.  Although she had been prescribed numerous medications, they did not completely relieve her symptoms and occasionally made her dizzy and tired.  On multiple occasions, she went to the hospital due to her symptoms.  According to her testimony and her statements contained in a December 2008 Function Report, these symptoms limited her ability to function and perform daily activities, including caring for her son, eating, walking for more than a block, driving a car, lifting more than ten pounds, bending, standing, and sitting.

Having summarized Ms. Hicks' statements, the ALJ then examined them in light of the evidence in the record and made three important findings.  First, he determined that Ms. Hicks had no clear diagnosis for her symptoms.  Second, he determined that Ms. Hicks exaggerated her symptoms.  Third, he determined that Ms. Hicks misled the ALJ regarding her ability to care for her child.  Based primarily on these three factual findings, the ALJ then found that Ms. Hicks'

statements regarding the severity, frequency, and limiting effects of her symptoms were not "fully persuasive."

In order to determine whether this finding was supported by substantial evidence, the Court examines each of these three supporting factual findings in turn.

### 1. The ALJ's Finding That Ms. Hicks' Had No Clear Diagnosis

The ALJ found that there was no definitive diagnosis for Ms. Hicks' symptoms. He stated that "[a]lthough the claimant's symptoms are well-documented, no clear diagnosis has been established."

Actually, Ms. Hicks had received several diagnoses of gastroparesis. The medical record indicates that Ms. Hicks was diagnosed with gastroparesis in November 2007 by Dr. Haque. This diagnosis was repeated throughout Ms. Hicks' medical reports. The ALJ's finding that gastroparesis was ruled out was based on an assessment from Drs. Hasan and Duman, who saw Ms. Hicks in January 2009 at the University of Colorado Hospital and "ruled out [gastroparesis] with an [endoscopy] and gastric emptying study." However, Dr. Burrows, a gastroenterologist who saw Ms. Hicks three times during January and February 2008, disagreed. Having reviewed all the records, he concluded that she had gastroparesis despite a normal colonoscopy. Similarly, Dr. Haque "felt that [Ms. Hicks'] symptoms were due to gastroparesis," despite normal results from an upper endoscopy and a gastric emptying study which were performed prior to her 2007 diagnosis. In July 2008, Drs. O'Connor and Kashikar indicated that Ms. Hicks had gastroparesis, with Dr. Kashikar noting that Ms. Hicks was "[a] highly complex 38-year-old female with diabetic gastroparesis." Finally, Ms. Hicks' treating physician, Dr. Wilk, consistently listed gastroparesis as the cause of her symptoms. In September 2008, he noted "[g]astroparesis. Not much more we can do." In January and April 2009, he wrote

"gastroparesis of unclear etiology." In June 2009, his assessment for Ms. Hicks was "gastroparesis." In September 2009, he wrote "[g]astroparesis. I don't know what else to do for her." In February 2010, his assessment was "[g]astroparesis. Intractable." The record does not support the ALJ's conclusion that gastroparesis was conclusively ruled out as diagnosis.

In addition, the ALJ's finding that there had been no clear diagnosis of gastroparesis at Step 4 is in direct conflict with his determination at Step 2 that Ms. Hicks had a severe impairment of gastroparesis, which conclusion was presumably based on Ms. Hicks' medical record.[5]

For these reasons, the Court finds the ALJ's finding that "there was no clear diagnosis of gastroparesis unsupported by substantial evidence.

### 2.  The ALJ's Finding that Ms. Hicks Exaggerated Her Symptoms

The second reason given for rejecting Ms. Hicks' testimony as to the severity and frequency of her symptoms was that she exaggerated it. The ALJ noted that she initially testified that she had daily diarrhea, nausea, and vomiting for the past three years, but then modified her testimony to limit her vomiting to four days per week for the past two years. In his decision, the ALJ contrasted this testimony with portions of the medical record:

> In January 2008, the claimant reported "occasional' diarrhea to her primary care physician (Exhibit 3F/9); nine months later a treatment note discusses "episodic" diarrhea (Exhibit 6F/2); 3 months earlier, a note said no diarrhea (Exhibit 7F/54): in May 2008, no diarrhea (Exhibit 7F/37). A treatment note in February 2008 said vomiting episodes were sporadic and variable, sometimes repeated vomiting "12 hours straight" (Exhibit 6F/4), and sometimes no vomiting (Exhibit 3F/3).

---

[5] Even if no clear diagnosis or test result existed to explain her symptoms, it does not automatically follow that Ms. Hicks' statements regarding the severity, frequency, and limiting effects of her symptoms were not fully persuasive. Diagnoses and medical tests, or lack thereof, are appropriate factors to consider when evaluating a claimant's symptoms. *See* SSR 96-7p. This makes sense, as it is logical to correlate certain diagnoses or positive test results with the existence of certain symptoms. However, it does not follow that an absence of a diagnosis or a negative test result correlates with exaggerated symptoms, particularly when the existence of those symptoms is not in doubt.

Turning to the record, the ALJ's finding that Ms. Hicks exaggerated the frequency of her diarrhea is supported by substantial evidence. Ms. Hicks testified that she had diarrhea daily. But the record indicates that Ms. Hicks' reported symptoms of diarrhea during medical exams or hospitalizations in November 2007, March 2008, May 2008,[6] September 2008, and October 2008. However, she did not report symptoms of diarrhea during medical evaluations on November 2007, June 2008, July 2008, September 2008, November 2008, January 2009, April 2009, June 2009, September 2009, February 2010, and June 2010. The lack of consistency in the medical record supports the ALJ's finding that Ms. Hicks exaggerated the frequency of her diarrhea.

In contrast, however, the ALJ's finding that Ms. Hicks exaggerated the severity and frequency of her vomiting is not supported by substantial evidence. At the hearing, Ms. Hicks testified about the frequency of her vomiting and nausea:

> Q So, speaking currently, now, ma'am, what's – how often do you get the nausea and vomiting?
> A Every day.
> Q How long has that been going on, where you have nausea and vomiting every day.
> A Three years.

The ALJ then clarified his questioning:

> Q So, do you understand what you're saying, ma'am, that for the past two years, you've been vomiting every day at a rate of roughly every half hour?
> A It's – I would say that, yes. Some days, I might skip a day where I'm not vomiting. Now, nausea is always there.
> Q But, ma'am, please understand, I'm only talking about the vomiting now.
> A Okay.
> Q So, I'm separating that out from the nausea.

---

[6] The record includes two separate medical records dated May 17, 2008. The first is from the Medical Center of Aurora. It indicates that Ms. Hicks was admitted at 3:47 pm and discharged at 8:47 pm. Ms. Hicks reported vomiting and nausea, but no diarrhea. The second record is from the University of Colorado Hospital. It indicates that Ms. Hicks was admitted at 2:33 pm and discharged at 6:44 pm. Ms. Hicks reported intense abdominal pain and two weeks of intermittent nausea, vomiting, and diarrhea. There is no obvious explanation in the record for two different records from the same date. On remand, the ALJ may inquire into the reason for these overlapping records.

> A Okay.
> Q I want to know what that's been like this past two years. It's either daily or it's not. So now you say some days, you don't have the vomiting. So, please describe for me, as best you can –
> A Okay.
> Q …for the past two years, how many days out of the week do you have the vomiting and how often?
> A Okay. I would say four days out of the week, usually like every other day. The way the vomiting is just – mostly at where it lasts most of the day. On the other days, that I might have, I have the – I might vomit a couple times and then I get it to stop. That's how it goes.

Although the ALJ found that Ms. Hicks modified her answer when questioned about the frequency of her vomiting, the dialogue is not consistent with the observation. Ms. Hicks seemed to be confused when first questioned about her vomiting. She then clarified her answer after further questioning, stating that her vomiting was four days per week or every other day. This testimony is consistent with her statements contained in a March 2009 medical exam, an April 2009 Physical Residual Functional Capacity Assessment, and the record.

The ALJ cited to three medical records to support his finding that Ms. Hicks exaggerated the frequency of her vomiting: a February 2008 record in which Dr. Wilk noted that Ms. Hicks again complained of "nausea and occasional vomiting"; a September 2008 clinic note from the University of Colorado Hospital in which Ms. Hicks' reported "up to nearly 12 hours straight of vomiting"; and a report by Dr. Burrows from February 2008 that indicated "no vomiting." However, the record as a whole does not support the finding. Indeed the February 2008 note from Dr. Burrows' records appears to be an anomaly. His notes from January 2008 indicate that Ms. Hicks' complained of "severe vomiting and nausea every week." In addition, Ms. Hicks' saw her treating physician, Dr. Wilk, thirteen times from November 2007 to June 2010. Gastroparesis is listed as a diagnosis, assessed ailment, or historical ailment in twelve of the records from these visits. Vomiting is noted in the records for eight of these visits. Dr. Wilk

gives various descriptions of the severity and frequency of Ms. Hicks' vomiting: intermittent vomiting in November 2007; a few episodes of vomiting in December 2007; occasional vomiting in February 2008; vomiting and nausea two to three days per week in January 2009; "no change in [Ms. Hicks'] usual rather severe nausea and vomiting" in April 2009; vomiting three times per week at unpredictable intervals in June 2009; unpredictable vomiting in September 2009; and "intractable and unpredictable vomiting" in February 2010.

In addition to her regular appointments with Dr. Wilk, Ms. Hicks sought outside treatment for her symptoms. She was admitted to the emergency room at least nine times from November 2007 to October 2008. Seven of these visits were due to nausea and vomiting. For example, in November 2007, she was admitted to the Medical Center of Aurora due to "several months of worsening nausea and vomiting." She reported a high level of pain and was treated with anti-nausea and anti-emetic medication, including Reglan and Pepcid. Her symptoms, nausea, vomiting, and pain, were consistent during these six ER visits, as was her treatment with anti-nausea, anti-emetic, and pain medication. Ms. Hicks' vomiting was described in the records from these ER visits as "numerous," "chronic," "persistent," and "intermittent."

These records are consistent with Ms. Hicks' testimony as to the severity and frequency of her vomiting. Ms. Hicks' testified that she had daily nausea and vomiting every other day or four days per week. Multiple records indicate vomiting up to three times per week. Additionally, the record indicates that Ms. Hicks' vomiting increased in severity and frequency from 2007 to 2010, which is also consistent with her testimony. Consequently, the ALJ's finding that Ms. Hicks exaggerated the frequency of her vomiting is not supported by substantial evidence.

### 3. The ALJ's Finding That Ms. Hicks' Misled The ALJ Regarding Her Ability To Care For Her Child

The ALJ also found that Ms. Hicks' failed to offer an alternate reason for leaving her son with her parents. Although Ms. Hicks testified that she sent her son to her parents' house during the week due to intense and frequent vomiting and nausea, the ALJ found that "…the claimant did not volunteer another, more plausible reason learned in subsequent testimony….The claimant's parents live within walking distance from the child's school."

Essentially, based on speculation, the ALJ determined found that Ms. Hicks lied. Then he reasoned that because she lied to him once, she was untruthful and therefore all of her other statements should be discounted. This was improper.

Both 20 C.F.R. § 404.1529(c)(4) and *Luna* set forth the analytical framework for assessment of subjective symptoms. Both require the ALJ to determine whether statements concerning symptoms are consistent with other evidence in the record, including objective medical evidence. There is no role in the ALJ's assessment for intuition and speculation. SSR 97-6p. Because this finding is not supported by substantial evidence in the record, it is insufficient.

Here, none of the reasons given by the ALJ for not finding Ms. Hicks' statements regarding the nature, frequency and severity of her vomiting to be persuasive are supported by substantial evidence in the record. Accordingly, reversal and remand is required.

### B. The ALJ's Assessment of Dr. Wilk's Medical Opinion

Although the Court concludes that a remand is required, it pauses to address a related issue – whether the ALJ gave sufficient reasons to justify the limited weight accorded to the opinion of Ms. Hicks treating physician, Dr. Wilk.

In a form entitled Workforce Development Medical Report, Dr. Wilk opined that Ms. Hicks would not be able to participate in classroom activity, work or training activity, or search for a job because she had intractable and unpredictable vomiting and medication side effects. He further stated that she could sit, stand, walk, and lift up to ten pounds frequently.[7]

The ALJ found that Dr. Wilk's opinion was entitled to less weight because it was inconsistent with his treatment notes. According to the ALJ, Dr. Wilk's reliance upon Ms. Hicks' nausea, vomiting, and the side effects of her medication was misplaced. He found that this evidence did not support the limitations Dr. Wilk outlined in his opinion.

Dr. Wilk was a treating physician. Although the ALJ was not required to give Dr. Wilk's opinion controlling weight per 20 C.F.R. § 404.1527(c)(2), he was required to give specific reasons for according less than controlling weight. The ALJ did not do so. He did not explain his reasoning for this decision, he did not discuss the factors found in 20 C.F.R. § 404.1527(c), particularly those dealing with the treatment relationship and did not specify the inconsistency between Dr. Wilk's treatment notes and his opinion which was of concern.

Dr. Wilk's opinion that Ms. Hicks had intractable and intermittent vomiting finds ample support in the record and in his treatment notes. As noted, *supra*, Dr. Wilk saw Ms. Hicks thirteen times from November 2007 to June 2010 and performed a physical exam each time. Gastroparesis was listed in twelve of the records from those visits as either a diagnosis, assessed ailment, or historical ailment, while vomiting was mentioned in eight of the records. For example, Dr. Wilk noted "no change in [Ms. Hicks'] rather severe nausea and vomiting" in January 2009, vomiting three times per week at unpredictable intervals in June 2009, and "intractable and unpredictable vomiting" in February 2010.

---

[7] Dr. Wilk also opined that Ms. Hicks was unable to work, which the ALJ correctly rejected as an opinion reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(1).

15

Based on the record, it does not appear that the ALJ properly evaluated Dr. Wilk's opinion, which independently requires reversal and remand.

For the forgoing reasons, the Commissioner of Social Security's decision is **REVERSED**, and the case is **REMANDED** for Step 4 reconsideration, particularly of Ms. Hicks' subjective symptoms and Dr. Wilk's medical opinion, and if appropriate, assessment at Step 5.  The Clerk shall enter a Judgment in accordance herewith.

DATED this 28th day of March, 2013

                                    **BY THE COURT:**

*/s/ Marcia S. Krieger*

                                    Marcia S. Krieger
                                    United States District Judge